UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| LAWANDA HER MANY HORSES, | ) | CIV.  06-5067-KES |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | ORDER AFFIRMING THE |
| | ) | COMMISSIONER'S DECISION |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner, Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Lawanda Her Many Horses, moves the court for reversal of the
Commissioner of Social Security's ("Commissioner") decision denying her
application for disability insurance benefits and supplemental security income
under Titles II and XVI of the Social Security Act.  Defendant opposes the
motion.  The court affirms the Commissioner's decision.

## PROCEDURAL BACKGROUND

Her Many Horses applied for disability insurance benefits and
supplemental security income on March 12, 2002, claiming an onset date of
February 21, 2001.  AR 79-82; AR 303-306.[1]  In her application for benefits,
Her Many Horses alleged that she had back, neck, and knee injuries.  AR 303.
The application was denied initially and again upon reconsideration.  AR 308-

_____

[1] All citations to "AR" refer to the appropriate page of the administrative
record.

315.  As a result, Her Many Horses timely requested a hearing before an Administrative Law Judge ("ALJ").  AR 53-54.  Her Many Horses testified in a hearing held on February 6, 2003, in Rapid City, South Dakota, before the ALJ. AR 29-41.[2]  Subsequently, Jerry Gravatt, a vocational expert, testified before the ALJ at a supplemental hearing on February 4, 2004.  AR 351-360. Following the supplemental hearing, the ALJ concluded in a decision dated February 24, 2004, that Her Many Horses was not disabled under the Social Security Act and, therefore, not entitled to disability benefits.  AR 12-23.  On November 30, 2004, the Appeals Council denied Her Many Horses' request for review and, thus, the ALJ's decision became the "final decision" under 42 U.S.C. § 405(g).

Her Many Horses filed a civil action in the United States District Court for the District of South Dakota, Western Division, appealing the February 24, 2004, decision  (CIV 05-5005-RHB).  The Commissioner moved the district court to enter an order of reversal with remand of the cause for further administrative proceedings pursuant to sentence four of 42 U.S.C. § 405(g).  AR 344-47.  Her Many Horses consented to the motion.  Id.  On June 7, 2005, the district court granted the motion and remanded the case to the ALJ to further develop facts regarding Her Many Horses' alleged mental impairments.  AR 343.  On July 6, 2005, the Appeals Council vacated the February 24, 2004,

---

[2] The ALJ in this case is the Honorable James W. Olson.

2

ALJ decision and remanded the case for further proceedings consistent with the order of the district court.  AR 363-364.[3]  A supplemental hearing was held on February 2, 2006, in Rapid City, South Dakota.  AR 894-918.  Dr. Nancy Winfrey, a clinical psychologist, and Her Many Horses testified at the hearing. Id.

On March 22, 2006, the ALJ determined, based upon reviewing all the evidence in the record, that Her Many Horses was not disabled within the meaning of the Social Security Act and, as a result, was not entitled to disability benefits.  AR 325-341.  Her Many Horses filed a timely request for review with the Appeals Council which was denied on June 27, 2006.  AR 316-318.  Accordingly, the ALJ's decision is the "final decision" under 42 U.S.C. § 405(g).[4]  Her Many Horses appeals to this court.

---

[3] More specifically, the Appeals Council ordered the ALJ to obtain evidence from a medical expert with psychological expertise to clarify the nature and severity of Her Many Horses' mental impairments and if warranted, to obtain evidence from a vocational expert to clarify the effect of the assessed limitations on Her Many Horses' occupational basis.  AR 363-364.

[4] Her Many Horses filed an additional application for disability benefits on December 21, 2004, alleging an onset date of February 25, 2004.  That application was denied initially and on reconsideration.  The ALJ considered that claim at the same time as Her Many Horses' March 2002 application.  AR 326.

## FACTUAL BACKGROUND

Her Many Horses was born on September 8, 1941.  AR 904.  She graduated from high school and received a Bachelor of Science degree in elementary education with an endorsement in the gifted education area.  AR 32.  Her Many Horses worked as an elementary school teacher in the field of gifted education for approximately thirty years.  Id.

Her Many Horses initially alleged her disability onset date was February 21, 2001, due to an injury from a fall.  Since that time, she alleges that she has experienced chronic left knee, neck, and lower back pain.  AR 99, 227.  On February 22, 2001, Her Many Horses went to the Indian Health Services Clinic ("IHS") where she reported she had fallen and injured her left knee in her employer's parking lot.  AR 213.[5]  Her Many Horses was diagnosed with a left knee contusion and given Tylenol.  AR 213.  She was allowed to return to work on March 12, 2001.  AR 212.

On March 28, 2001, Her Many Horses returned to IHS, complaining of left knee pain and swelling.  AR 208.  The examination revealed no gross

---

[5] Her Many Horses saw Dr. Steven Manlove for psychiatric treatment, Dr. Jackie Gilbertson for a psychological evaluation, and Dr. Nancy Winfrey, a psychologist.  All three physicians testified regarding Her Many Horses' mental status at the February 2006 hearing.  Because Her Many Horses is not contesting the ALJ's finding in relation to this matter, the court will not discuss the mental aspects of Her Many Horses' claim in this opinion.

deformity, knee stability with no effusion, and generalized tenderness.  AR 208.
Her Many Horses was prescribed Tylenol.  AR 208.

On April 4, 2001, Lee Ahrlin, M.D., an orthopedist, evaluated Her Many
Horses' left knee complaints.  AR 140.  Dr. Ahrlin examined previous x-rays as
well as x-rays he took himself of Her Many Horses' knee.  He determined the x-
rays exhibited no bony abnormalities and no fractures.  Further, his
examination found full range of motion of her knee and stable ligaments, but
also noted tenderness over both the medial and the lateral joint line, and
complaints of discomfort during a knee rotation test.  He opined that "her knee
problem [was] pretty much resolved," recommending Her Many Horses
continue engaging in isometric exercises.  Dr. Ahrlin determined Her Many
Horses could return to work the first part of the following week without
restrictions.  AR 140.

On April 13, 2001, Her Many Horses went to the IHS complaining of neck
pain.  She was diagnosed with cervical osteoarthritis and prescribed Ibuprofen.
AR 207.

On April 30, 2001, Rapid City Regional Hospital records indicate Her
Many Horses continued to complain of knee pain.  AR 130.  As a result,
Dr. Ahrlin ordered an MRI scan of Her Many Horses' left knee, which was
normal.  AR 139.  Dr. Ahrlin noted that Her Many Horses had minimal
tenderness at the joint space and further noted that she had not been

completing the recommended isometric exercises.  Id.  Her Many Horses also complained of neck pain; however, examination showed no bony abnormalities, no sensory or motor deficits, full range of motion, and no other symptoms of neck problems.  AR 139.  Dr. Ahrlin opined Her Many Horses could return to work.  AR 139.

On May 8, 2001, Her Many Horses went to IHS with complaints of neck pain, and on May 10, 2001, she complained of chest pain, although her EKG was normal.  AR 205-06.

On June 25, 2001, Her Many Horses saw Dr. Ahrlin for a follow-up and continued to report knee pain.  AR 139.  His examination indicated slight patella femoral crepitation in both knees, minimal tenderness of the joint line, and full range of knee motion.  AR 139.  Her Many Horses experienced some discomfort during knee rotation and twist exams.  AR 139.  Dr. Ahrlin opined there were no limitations on Her Many Horses' activities and recommended she walk two to three miles every day, or at least every other day.  He also noted that her knee would continue to improve if Her Many Horses would do more strengthening type activities.  AR 138, 139.  Additionally, Dr. Ahrlin reported that Her Many Horses was at maximum medical improvement in relation to her February fall and that other than "some mild chondromalacia," her knee was essentially normal.  AR 138.

6

On July 5, 2001, Her Many Horses reported to IHS that she fell on July 4, 2001, and had re-injured her knee.  Examination revealed a left knee contusion and she was prescribed Tylenol.  AR 199.  On July 12, 2001, Her Many Horses returned to IHS complaining of left knee pain, and an examination indicated knee contusion.  AR 198.

On August 9, 2001, Her Many Horses complained of swollen legs, but an examination showed dependent edema.  AR 196.

On September 25, 2001, Her Many Horses saw Dale R. Anderson, M.D., an orthopedist, for a second opinion.  AR 160-62.  Her Many Horses indicated she had pain in her left knee "almost every day," repeated swelling of her legs, and increased pain when she walked.  AR 162.  Dr. Anderson's examination revealed that Her Many Horses walked smoothly without a limp, her range of motion was intact, and her knee ligaments were intact.  Id.  Dr. Anderson determined there were no specific physical restrictions or limitations   on the use of Her Many Horses' knee.  AR 161.  Additionally, he was unable to identify a specific abnormality in the knee, other than diffuse tenderness and pain.  Id.  Dr. Anderson recommended Her Many Horses participate in physical therapy in order to strengthen her muscles and diminish her knee complaints.  Id.  Dr. Anderson also indicated that he believed Her Many Horses' primary problem was pain and depression as a result of her anger about being replaced in her job as a teacher and her husband's continuing medical problems.  AR

7

160.  On October 8, 2001, Her Many Horses returned to Dr. Anderson's office, demanding medication for her pain.  It was noted that she did not appear to be limping while walking.  AR 160.  Her Many Horses failed to return for scheduled follow-up appointments with Dr. Anderson on November 5, 2001, and December 21, 2001.  AR 159.

On October 20, 2001, Dr. Mills, a neurologist, examined Her Many Horses regarding her complaints of back and left knee pain.  AR 152-55. Dr. Mills examined Her Many Horses' back and found negative straight leg raising tests, mild patellofemoral crepitus, some pain across the knee with stresses, some tenderness in the low back and posterior cervical thoracic junction, and no radicular signs.  AR 154.  Her Many Horses demonstrated a normal gait and station with some mild left knee antalgia.  AR 154.  Dr. Mills determined that Her Many Horses had musculoskeletal pain complaints with mild degenerative changes.  AR 154.  He suggested an anti-inflammatory medication along with physical therapy.  AR 154-55.

On November 15, 2001, Her Many Horses began to attend physical therapy; however, she was discharged on January 28, 2002, because of her failure to schedule physical therapy sessions after December 17, 2001.  AR 164.  It was noted that Her Many Horses displayed mild myofascial tenderness in the lumbar and thoracic paraspinals, moderate myofascial tenderness in the

upper back and neck, and moderate tenderness over the left knee medial joint line.  AR 164.

On December 12, 2001, Her Many Horses went to IHS with orthopedic complaints and was given medication.  AR 193.

On January 23, 2002, Her Many Horses saw Dr. Mills for an Independent Medical Evaluation.  AR 260-65.  Dr. Mills diagnosed Her Many Horses with left knee contusion and persistent pain as well as cervical and lumbar pain around the neck, back, and knee area.  AR 263.  He determined that Her Many Horses should avoid stooping, kneeling, and squatting as well as frequent lumbar flexion, bending, and twisting.  AR 264.

On March 6, 2002, Her Many Horses went to IHS to receive treatment for her neck, lower back, and left knee complaints.  AR 191.

On June 4, 2002, Her Many Horses saw Dr. Mills for a second neurological exam.  AR 252-53.  He indicated that Her Many Horses' movements were "somewhat pain inhibited."  AR 252.  He further reported that she tended to favor the left knee and leg when walking.  Also, he determined there was "no evidence of effusion with her having fair active assisted and passive range of motion."  Id.  He noted the straight leg raise maneuver was negative.  Id.  He reported that his diagnosis of Her Many Horses remained the same as his independent medical examination of her on January 23, 2002.  AR 253.

On September 26, 2002, George Ceremuga, D.O., a doctor of osteopathic medicine, examined Her Many Horses at the request of the Commissioner.  AR 227-29.  Dr. Ceremuga indicated Her Many Horses had a history of left knee trauma, a normal MRI and x-rays, and no significant restrictions of motion. Additionally, he reported chronic cervical and lumbar back pain and noted the x-rays revealed no significant arthritis.  AR 229.  Dr. Ceremuga opined Her Many Horses could "probably" stand for ten to fifteen minutes at a time, walk at her own pace, sit throughout an eight-hour day, and lift no more than twenty pounds.  Id.

On October 9, 2002, F. R. Entwistle, M.D., examined Her Many Horses' records pursuant to the Commissioner's request.  AR 230-37.  Dr. Entwistle performed a Physical Residual Functional Capacity Assessment.  AR 230-37. He determined Her Many Horses could lift and/or carry ten pounds frequently and twenty pounds occasionally, stand and/or walk as well as sit for six hours in an eight-hour workday, and had no limitations on her ability to push and/or pull.  AR 231.   Dr. Entwistle further found Her Many Horses could not climb ladders, ropes, or scaffolds.  AR 232.  He also noted, based on objective findings, that Her Many Horses could safely do more activities.  AR 235.

On December 19, 2002, Her Many Horses went to IHS for replacement of her TENS unit.  AR 600.  Her Many Horses could reach her toes without

10

difficulty and walk without a limp.  Further, she was not in acute distress and was independent in all activities of daily living.  AR 600.

On January 6, 2003, Her Many Horses requested a review of an MRI that was taken in Rapid City in 2002.  She reported that the TENS unit and Vioxx were not helping with her cervical and lumbar spine pain.  AR 596.  On January 24, 2003, Her Many Horses complained of chronic lower back pain when picking up her TENS unit.  AR 593.

On January 27, 2003, Her Many Horses went to IHS and stated that she had fallen.  AR 587.  A lumbar x-ray revealed slight narrowing of the disc space at L4-5 with mild degenerative change.  AR 590.  Her Many Horses was given medication and was instructed to put ice on her knee.  AR 588.

On February 6, 2003, Her Many Horses testified regarding her medical conditions at a hearing before the ALJ.  AR 31-41.  She stated she experienced constant pain in her knee, lower back, and neck.  AR 33-34.  She further stated she wore a TENS unit and took Vioxx and Naproxen for her pain.  Id. Additionally, she reported she was taking medications for depression and continued to have symptoms of depression.  AR 36.  She testified she could sit for one hour, stand for fifteen minutes, walk for fifteen to twenty minutes, and lift no more than ten pounds.  AR 35, 38.  She also testified she could not bend over and touch her toes because it was too painful on her back.  AR 35.  She explained her typical day included getting up and showering, cooking breakfast

11

with her husband's help, eating breakfast, doing dishes for 15 minutes, sweeping a small area, lying down for half an hour to an hour, watching television, doing bead work, and cooking supper with her husband.  AR 37-38. She stated she did housework but had difficulty completing the tasks.  AR 39. Additionally, she reported falling once a month.  AR 40.

On April 2, 2003, Her Many Horses called IHS, requesting Actipid.  AR 577.  She stated she was starting work on her garden and explained she took the medication before being in the sun.  Id.

On April 9, 2003, Her Many Horses went to IHS with complaints of neck and back pain and was prescribed medication.  AR 575-76.  On April 16, 2003, Her Many Horses returned to IHS complaining of neck and back pain.  AR 571. She was diagnosed with chronic lower back pain with L4-5 narrowing and was prescribed medication.  AR 571.

On April 22, 2003, Her Many Horses went to the IHS emergency room and reported a two-week history of chest pain.  AR 564.  She was transferred and then admitted to Rapid City Regional Hospital for cardiovascular evaluation.  AR 568.  On admission, it was reported that her EKG was unchanged and laboratory results were negative for myocardial infarction.  AR 689, 767, 722, 788-94, 821-22, 835-40.  On April 23, 2003, cardiac catherization revealed 80 percent obstruction of the posterior descending portion of the right coronary artery, which was remedied with angioplasty.  AR

12

689, 778-80.  On April 24, 2003, an appendectomy and excision of a gangrenous area of the cecum were performed in response to Her Many Horses' abdominal pain.  AR 815.  Additionally, in relation to Her Many Horses' back complaints, an MRI scan indicated "mild degenerative changes" of the lumbar spine.  AR 690, 833.  Thoracic, lumbar, and cervical spine x-rays were normal. AR 827-29.  Her Many Horses was advised to avoid lifting objects for two weeks, but her activities were not otherwise restricted.  AR 693.

On April 27, 2003, Her Many Horses was readmitted to Rapid City Regional Hospital for evaluation of abdominal pain complaints.  AR 633-686.  It was determined that the abdomen was soft and there was moderate tenderness with some voluntary guarding in the right lower quadrant and the lower midline between incisions.  AR 666.   Jeffrey S. Marrs, M.D., examined Her Many Horses based on her back pain complaint.  AR 667-68.  A lumbar MRI scan demonstrated "some mild disk protrusions at L4-5 and L5-S1, with no indication of impingement on the neurological structures."  AR 668.  Dr. Marrs opined Her Many Horses experienced chronic mechanical back pain.  He recommended she should not use narcotic medication but should engage in physical therapy.  AR 668.  On April 29, 2003, Her Many Horses was discharged with instructions to lift nothing more than ten pounds for four weeks, but no other restrictions were placed on her activities.  AR 635.

13

On May 4, 2003, Her Many Horses went to IHS emergency room, reporting chest pain.  AR 556-58.  The pain was improved with medication.  AR 556.  On June 19, 2003, Her Many Horses returned to IHS complaining of neck, back, and chest pain.  She was prescribed medication.  AR 542.

On August 2, 2003, Her Many Horses returned to IHS with back pain complaints.  AR 532.  IHS personnel examined her January 28, 2003, x-rays and concluded they showed no abnormalities of the cervical spine and mild degenerative joint disease at L4-5.  AR 532.  On August 18, 2003, Her Many Horses went to IHS and was prescribed medication for her back and neck complaints.  AR 530.

On September 16, 2003, Her Many Horses went to IHS complaining of lower back and neck pain and was prescribed medication.  AR 528.  IHS personnel reported a lumbar MRI scan in April 2003 showed mild degenerative changes.  AR 528.

On October 1 and 14, 2003, as well as on January 7 and 20, 2004, Her Many Horses visited IHS with complaints of back pain and was prescribed medication.  AR 505, 510, 522, 525.  On January 7, 2004, it was reported Her Many Horses was "still walking [a] good half mile."  AR 510.

On October 22 and 29, 2003, Her Many Horses called IHS regarding chronic back pain.  AR 519, 520.  On December 9, 2003, she reported chronic pain syndrome and requested a refill of Nemontin.  AR 515.

14

On February 4, 2004, at a supplemental hearing, Jerry Gravatt, a vocational expert, testified regarding Her Many Horses' ability to return to work.  AR 353-360.  In response to the ALJ's hypothetical question, Gravatt opined Her Many Horses could perform her past job as a teacher.  AR 354-55.[6]

On February 10, 2004, Her Many Horses complained of low back and hip pain at IHS and was referred to the pain clinic.  AR 499.  On February 25, 2004, Her Many Horses failed to attend her physical therapy appointment.  AR 492.

On April 7, 2004, Her Many Horses returned to IHS with complaints of lower back pain and was prescribed medication.  AR 486.  On April 22, 2004, IHS personnel reported Her Many Horses refused to attend recommended physical therapy.  AR 485.

On July 6, 2004, and July 30, 2004, Her Many Horses went to IHS and was prescribed medication for back pain complaints.  AR 473, 470.

On July 28, 2004, Her Many Horses went to the Regional Pain Management Center and was examined by Steven Frost, M.D., an

---

[6] The ALJ asked Gravatt to evaluate an individual with Her Many Horses' age, education, and work experience who could not stoop, kneel, squat, bend, or twist.  AR 354.  Further, the individual in the hypothetical had slight limits on the abilities to understand and remember detailed instructions to make work-related decisions, and moderate limits on the abilities to execute detailed instructions, maintain attention and concentration for long periods, sustain a routine without special supervision, complete a work day or work week, and perform at a consistent pace.  AR 354.

anesthesiologist, concerning her complaints of low back pain.  AR 877-91.
Dr. Frost's examination revealed full range of motion of the cervical spine with
no tenderness or deformity and a normal thoracic spine.  AR 879.  Further, Her
Many Horses had full range of motion of the lumbar spine despite tenderness,
but did have increased pain with the right lateral bending and extension.  AR
879.  Strength, motor functioning, sensation, reflexes, gait, station, straight leg
raising tests, and stride were normal.  AR 880.  Dr. Frost noted the lumbar
MRI scan and x-rays showed mild disk degeneration, mild disk protrusion and
facet arthritis.  AR 879.  He suggested Her Many Horses receive a facet
injection and participate in physical therapy.  AR 880-81.

On August 4 and 13, 2004, Her Many Horses was prescribed pain
medication for back complaints after examination at IHS.  AR 465, 467.  On
October 19 and 27, 2004, Her Many Horses went to IHS complaining of back
pain and was prescribed pain medication.  AR 459-460.  On January 26, 2005,
Her Many Horses returned to IHS complaining of back and hip pain and was
prescribed medication.  AR 453-54.  On May 10, 2005, Her Many Horses did
not keep a scheduled appointment with a rheumatologist.  AR 446.  On May 25
and August 17, 2005, Her Many Horses again returned to IHS with back
complaints and was prescribed pain medication.  AR 438, 445, 447.  On
October 26, 2005, Her Many Horses was examined at IHS in relation to lower
back and hip pain complaints.  AR 429.

On December 2, 2005, Alvin E. Wessel, Jr., M.D., examined Her Many Horses at the request of the Commissioner.  AR 422-24.  Dr. Wessel noted the cervical spine appeared to have normal flexion and extension, although Her Many Horses reported being stiff on motion.  Dr. Wessel further noted more extension seemed to cause pain.  Additionally, he noted her mid-back revealed some straightening of the lumbosacral area without evidence of any bony spur changes or abnormality.  AR 424.  Dr. Wessel assessed "chronic back pain and stiffness, more of a symptom than anything" and "mild left knee discomfort." AR 424.  Dr. Wessel also noted pain appeared to be controlled with medication and stiffness was a major issue.  Id.

On February 2, 2006, Her Many Horses again testified regarding her medical conditions at a hearing before the ALJ.  AR 896-918.  She testified the pain in her knee, back, and neck was worse than in 2003.  AR 907.  She further testified she was falling down twice a month.  AR 906.  She also stated she had stopped wearing the TENS unit because it irritated her skin and instead used a pain patch which she purchased at the store.  AR 907. Additionally, she stated she had a new cardiovascular impairment, had required heart surgery in April 2003, and continued to have chest pain and left arm numbness.  AR 908.

She testified she was no longer taking Zoloft or Ceroquel and was not taking any medications for depression or psychological problems.  AR 909.  She

17

testified she could stand for five minutes, walk for about five minutes, and sit for about ten to fifteen minutes.  AR 909, 910.  She further stated she tried not to lift anything over five pounds and can hardly bend over.  AR 912.

She testified her daily routine included waking up and showering, starting breakfast with the help of her husband, reading, beading, watching television, sweeping a small area, making "about half of the bed," and going shopping with her husband although she was unable to finish the shopping. AR 910-11, 913, 914.  She had to lay down three times a day.  AR 911.

She stopped teaching Sunday school, does not do any yard or garden work, and does not participate in any sports.  AR 914.  She also stated she felt she was having memory loss.  AR 911.

## ALJ DECISION

On March 22, 2006, the ALJ found that Her Many Horses was not disabled and, therefore, denied her application for benefits.  AR 325-341.  The

18

ALJ applied the sequential five-step evaluation process[7] in reaching his conclusion.

At step one, the ALJ found that Her Many Horses had not engaged in substantial gainful activity since her alleged onset date.  AR 327.  At step two, the ALJ found that Her Many Horses had a history of trauma to the left knee, mild disk degeneration, mild disk protrusion, facet arthritis, chronic pain, non-insulin dependent diabetes, a history of hypertension, depression, a mood disorder due to general medical condition, and a pain disorder, which are impairments that are considered to be "severe" under the Social Security Regulations.  AR 328.  At step three, the ALJ concluded that Her Many Horses' impairments, singly or in combination, were not included in the presumptively disabling impairments listed in the regulations.  AR 330.

The ALJ next determined Her Many Horses' residual functional capacity (RFC).  The ALJ found Her Many Horses retained the RFC "to stand for 10 to 15

---

[7] The five-step sequential analysis as outlined by the Eighth Circuit is: (1) whether the claimant is presently engaged in a "substantial gainful activity;" (2) whether the claimant has a severe impairment—one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity to perform his or her past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove that there are other jobs in the national economy that the claimant can perform.  See Baker v. Apfel, 159 F.3d 1140, 1143-44 (8th Cir. 1998).

minutes at a time, walk at her own pace, and sit throughout an 8 hour day, with lifting no more than 20 pounds at a time." AR 339. He further noted she should "avoid stooping, kneeling, squatting, frequent lumbar flexion, bending, and twisting." Id. In determining Her Many Horses' RFC, the ALJ found Her Many Horses' allegations regarding her physical limitations were not completely credible. AR 340. Based on his RFC determinations as well as the testimony of Jerry Gravatt, a vocational expert, the ALJ concluded that Her Many Horses could perform her past relevant work as a teacher. AR 341. As a result, the ALJ terminated his analysis at step four and concluded that Her Many Horses was not entitled to disability benefits. AR 340-341.

## STANDARD OF REVIEW

The decision of the ALJ must be upheld if it is supported by substantial evidence in the record as a whole. See 42 U.S.C. § 405(g); Choate v. Barnhart, 457 F.3d 865, 869 (8th Cir. 2006). Substantial evidence is less than a preponderance but enough evidence that a reasonable mind might find it adequate to support the conclusion. See Baker v. Barnhart, 457 F.3d 882, 892 (8th Cir. 2006); see also McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000); Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971). Review by this court extends beyond a limited search for the existence of evidence supporting the Commissioner's decision to include giving consideration to evidence in the record which fairly detracts from the decision.

See Maresh v. Barnhart, 438 F.3d 897, 898 (8th Cir. 2006); Craig v. Apfel, 212 F.3d 433, 435 (8th Cir. 2000).

The court's role under section 405(g) is to determine whether there is substantial evidence in the record as a whole to support the decision of the Commissioner and not to re-weigh the evidence.  See Vester v. Barnhart, 416 F.3d 886, 889 (8th Cir. 2005); Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005).  Furthermore, a reviewing court may not reverse the Commissioner's decision "merely because substantial evidence would have supported an opposite decision."  Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995)); see also Eichelberger v. Barnhart, 390 F.3d 584, 589 (8th Cir. 2004).  The court must review the Commissioner's decision to determine if an error of law has been committed.  See Olson ex rel. Estate of Olson v. Apfel, 170 F.3d 820, 822 (8th Cir. 1999); Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992).  Issues of law are reviewed de novo with deference given to the Commissioner's construction of the Social Security Act.  See Smith, 982 F.2d at 311; see also Olson ex rel. Estate of Olson, 170 F.3d at 824.  If the ALJ's decision is supported by substantial evidence, then this court cannot reverse the decision of the ALJ even if the court would have decided it differently.  See Baker, 457 F.3d at 892.

## DISCUSSION

Her Many Horses asserts that the ALJ erred by improperly discounting her credibility because he failed to discuss her 2006 hearing testimony and only briefly reviewed IHS records from 2003, 2004, 2005, and 2006 as well as Dr. Wessel's consultative exam report dated January 11, 2006.  Pl.'s Br. (Docket 16) at 8-9.  In response, the government contends there is substantial evidence supporting the ALJ's determination of credibility.  Def.'s Br. (Docket 17) at 19.

In assessing a claimant's credibility as to her subjective complaints, an ALJ must consider her "(1) daily activities; (2) duration, frequency, and intensity of pain; (3) precipitating and aggravating factors; (4) dosage, effectiveness and side effects of medications; and (5) functional restrictions." Polaski v. Heckler, 751 F.2d 943, 949 (8th Cir. 1984).  Other relevant factors include the claimant's relevant work history and the absence of objective medical evidence to support the complaints.  Id.  Still other relevant factors include evidence of effective medication resulting in relief and failure to follow a recommended course of treatment.  Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005).  In rejecting a claimant's complaints of pain as not credible, the ALJ should "detail the reasons for discrediting the testimony and set forth the inconsistencies found." Lewis v. Barnhart, 353 F.3d 642, 647 (8th Cir. 2003). If adequately explained and supported by the record the court will not disturb

an ALJ's credibility determination.  See Dukes v. Barnhart, 436 F.3d 923, 927 (8th Cir. 2006).

In his decision, the ALJ outlined the factors he was required to discuss pursuant to the Social Security Regulations, Social Security Ruling 85-16, and Polaski v. Heckler, 739 F.2d 1320 (8th Cir. 1984).  Further, he mentioned case law which set forth other factors for the ALJ to consider when evaluating the credibility of a claimant's subjective complaints.  He also noted that an ALJ is expected to specifically discuss the reasons for discrediting testimony and mention any inconsistencies found within the record.  AR 331.

The ALJ stated that he considered all relevant evidence as well as the subjective complaints of Her Many Horses.  The ALJ specifically discussed Her Many Horses' 2003 hearing testimony in relation to the Polaski factors.  He discussed her daily activities and noted she attended to her personal needs, cooked "some meals," performed "some household chores" but had to rest every half hour, and went grocery shopping although she could not lift or carry groceries.  He also explained her typical day included waking up and eating breakfast, washing dishes for fifteen minutes, sweeping a small area, lying down for half an hour to an hour, watching television, doing bead work, and cooking dinner with her husband.  He acknowledged her testimony that she performed little housework because it was difficult to complete tasks.  The ALJ also discussed Her Many Horses' pain complaints and stated she was in

23

constant pain as a result of a fall which injured her back, neck, and knee.  The ALJ was cognizant of the fact that her left knee was weak and gave out, causing her to fall about once a month.  He recognized she also suffered from constant lower back and neck pain.  The ALJ considered precipitating or aggravating factors and took into account the fact she suffered from depression and feared psychotic episodes.  He mentioned the medications Her Many Horses had been taking, including her constant use of a TENS unit as well as the medications that were prescribed to Her Many Horses by various doctors for her pain.  In regard to her functional restrictions, he indicated she was limited to standing, sitting, or performing household tasks for 15 to 20 minutes.  AR 332.

The ALJ found that Her Many Horses' statements regarding her impairments and their effect on her ability to work were "not completely" credible in light of the medical evidence and the discrepancies between her 2003 hearing testimony and the information located in the documentary reports.  The ALJ specifically set forth such inconsistencies.  The ALJ noted Her Many Horses claimed she experienced chronic left knee, neck, and lower back pain since February 21, 2001; however, the record revealed that she had no complaints of neck pain until April of 2001.  Subsequently, in September 2001, during her examination, she complained of knee pain but made no allegations of back or neck pain.  In that examination, the doctor noted her

24

primary problem was pain and depression as a result of her anger about her husband's health and being replaced in her job as a teacher.  Further, although Her Many Horses alleged her knee was constantly swollen, no medical records supported such a finding.  She also failed to complete the recommendations made by treating doctors, such as physical therapy and other exercises.  AR 338.  Such inconsistencies demonstrate a basis for the ALJ's credibility determination.  Accordingly, the court finds that the ALJ correctly discredited Her Many Horses' subjective complaints made at the 2003 hearing.

Additionally, the court notes there are similar inconsistencies between Her Many Horses' 2006 hearing testimony and the record as a whole.  Her Many Horses' 2003 hearing testimony and 2006 hearing testimony do not differ significantly.  While Her Many Horses' 2006 hearing testimony indicated the pain in her knee, back, and neck were worse than in 2003, her daily activities had not significantly changed.[8]  Further, although Her Many Horses' 2006 hearing testimony alleged she could stand for five minutes, walk for about five

---

[8] In 2003, Her Many Horses testified that her typical day included waking up and showering, cooking breakfast with the assistance of her husband, doing dishes for approximately fifteen minutes, sweeping a small area, watching television, doing bead work, and cooking supper with her husband.  AR 37-38. In 2006, she testified that her typical day included waking up and showering, starting breakfast with the help of her husband, making "about half of the bed," sweeping a small area, reading, beading, watching television, and going shopping with her husband although she is unable to complete the shopping. AR 910-11, 913, 914.

minutes, and sit for about ten to fifteen minutes, which is different from her

minutes, and sit for about ten to fifteen minutes, which is different from her

2003 testimony,[9] medical evidence does not support such allegations.  See

Guilliams v. Barnhart, 393 F.3d 798, 802 (8th Cir. 2005) (stating the absence of

objective medical evidence to support a claimant's complaints is a relevant

factor in credibility determination).  Medical evidence in the record dated after

Her Many Horses' 2003 hearing testimony indicated doctors only restricted her

activities twice.  On April 24, 2003, Her Many Horses' activities were

unrestricted except that she was advised not to lift objects for two weeks.  AR

693.  Similarly, on April 29, 2003, Her Many Horses was instructed not to lift

more than ten pounds for four weeks but no other restrictions were placed on

her activities.  AR 635.  The record demonstrates that Her Many Horses'

activities were not restricted at any other time or in any other fashion other

than as indicated on those two dates.

The court also notes it is significant that on April 2, 2003, less than two

months after her 2003 testimony, she called IHS requesting Actipid.  AR 577.

She stated she needed the medication because she was starting to work on her

garden and would be in the sun.  Id.  This is inconsistent with her testimony at

both the 2003 hearing and the 2006 hearing wherein she testified regarding

limitations of her physical activities.  See Johnson v. Apfel, 240 F.3d 1145,

---

[9] Her Many Horses' 2003 testimony alleged she could sit for one hour, stand for fifteen minutes, and walk for about ten to twenty minutes.  AR 35, 38.

1148 (8th Cir. 2001) (stating acts which are inconsistent with a claimant's assertion of disability reflect negatively on the claimant's credibility).  Further, in 2006, it was noted Her Many Horses had "chronic back pain and stiffness, more of a symptom than anything," "mild left knee discomfort," and her pain appeared to be controlled with medication.  AR 424.  Such medical evidence does not support Her Many Horses' subjective complaints.

Her Many Horses argues that the ALJ's credibility determination is deficient because he did not explicitly mention her 2006 hearing testimony. The fact that the ALJ did not specifically mention Her Many Horses' 2006 testimony in his decision does not necessarily mean that he did not consider such evidence in reaching his decision.  Craig v. Apfel, 212 F.3d 433, 436 (8th Cir. 2000).  See also Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998) (internal citations omitted) ("[a]lthough required to develop the record fully and fairly, an ALJ is not required to discuss every piece of evidence submitted . . . [and][a]n ALJ's failure to cite specific evidence does not indicate that such evidence was not considered").  Despite the ALJ's failure to mention Her Many Horses' 2006 hearing testimony, the court finds the ALJ credibility determination is supported by substantial evidence.

Similarly, the ALJ's brief consideration of the IHS records and Dr. Wessel's report is not significant.  This medical evidence is substantially similar to the medical evidence the ALJ thoroughly considered.  The ALJ was

27

correct in noting that "[s]ince her hearing of February 2004 medical records indicate little change in the claimant's conditions and offer little probative value." AR 338. The court has reviewed these medical records and determines such records are cumulative of previous medical records. Although the ALJ should have elaborated on the medical evidence in the record dated after Her Many Horses' 2003 hearing testimony, "a 'deficiency in opinion-writing is not a sufficient reason to set aside an ALJ's finding where the deficiency [has] no practical effect on the outcome of the case.' " Draper v. Barnhart, 425 F.3d 1127, 1130 (8th Cir. 2005) (internal citations omitted). Accordingly, the court finds the ALJ did not err in his credibility determination.

## CONCLUSION

"The credibility of a claimant's subjective testimony is primarily for the ALJ to decide, not the courts." Pearsall v. Massanari, 274 F.3d 1211, 1218 (8th Cir. 2001). The fact that the ALJ did not elaborate on his conclusions regarding the credibility of Her Many Horses' 2006 testimony as well as the medical evidence in the record dated after her 2003 testimony does not require reversal, because the record supports his overall conclusion. See Pepper ex rel. Gardner v. Barnett, 342 F.3d 853, 855 (8th Cir. 2003).

Based on the foregoing, it is hereby

28

ORDERED that the Commissioner of Social Security's decision denying

Her Many Horses' claim for disability insurance benefits under the Social

Security Act is affirmed.

Dated August 16, 2007.

BY THE COURT:


/s/ *Karen E. Schreier*
KAREN E. SCHREIER
CHIEF JUDGE

29